UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Edward M. von Der Schmidt<br>Aka Eddie von der Schmidt,<br><br>~ and ~<br><br>Keanna Ngô<br>          Plaintiffs,<br><br>     ~against~<br>Tom Higgins,<br>Flavio Colella, and<br>Silverstein Properties, D/B/A<br>River Place Management<br>          Defendants. | Civil Action No. 23-3389<br><br><br><br><br><br><br>Complaint<br><br>Jury Trial Demand |

Plaintiff Edward M. von der Schmidt ("Mr. von der Schmidt" or "Eddie") and Keanna Ngô ("Ms. Ngô") by and through their attorney, Tyrone Blackburn, Esq. ("Mr. Blackburn") hereby file this Complaint against Defendant Silverstein Properties, D/B/A River Place Management ("River Place," or "Defendant Corporation"), Tom Higgins ("Higgins," "Defendant Higgins"), and Flavio Colella ("Colella," "Defendant Colella") and state as follows:

### NATURE OF ACTION

1. As set forth herein, Defendants River Place, Higgins, and Colella (collectively the "Defendants") were major participants in events leading up to and including Defamation, Premises Liability, and Negligent Infliction of Emotional Distress of Mr. von der Schmidt and Ms. Ngô.

2. Plaintiffs bring this action for Defamation, Premises Liability, Negligent Infliction of Emotional Distress, Intentional Infliction of Emotional Distress, and Negligent Hiring and Retention.

3. Plaintiffs seek injunctive and declaratory relief, compensatory damages, punitive damages, liquidated damages, and reasonable attorneys' fees and costs as remedies for violations of

Plaintiffs' rights.

## PARTIES

4. Mr. von der Schmidt is a multiethnic Hispanic American Princeton University graduate. Mr. von der Schmidt was a tenant in Defendant Corporation building for over thirteen years. Mr. von der Schmidt currently resides in California.

5. Ms. Ngô is a multiethnic Asian-American woman. Ms. Ngô is the long-term partner of Mr. von der Schmidt. She was a tenant in Defendant Corporation building for over two years and is currently domiciled with him in California.

6. Defendant Corporation is a family-held, full-service real estate development, investment, and management firm based in New York City. The Firm is headquartered in this Judicial District.

7. Defendant Higgins is Defendant Corporations Head of Security. Upon information and belief, Higgins resides in this Judicial District.

8. Defendant Colella is Defendant Corporation's building manager and building engineer. Upon information and belief, Higgins resides in this Judicial District.

## JURISDICTION AND VENUE

9. This Court has personal jurisdiction over Defendants under and consistent with the Constitutional requirements of Due Process in that Defendants, acting directly or through their agents or apparent agents, committed one or more of the following:

    a. The transaction of any business within the state;

    b. The making of any contract within the state;

    c. The commission of a tortious act within this district; and

    d. The ownership, use, or possession of any real estate in this state.

    e. The Court has supplemental jurisdiction over Plaintiff's related claims under state and local law under 28 USC § 1367(a).

    f. Plaintiff is a resident of the Carolinas, while Defendant both reside in New York.

g. Damages far exceed the $75,000.00 threshold for diversity jurisdiction.

## FACTUAL BACKGROUND

10. Mr. von der Schmidt was a well-regarded tenant for thirteen years at River Place.  Ms. Ngô had been a resident for two years, and the couple shared many friends who were residents in the building.

11. Safety is a fundamental right, and property owners are required to maintain safe stairways, elevators, ingress/egress methods, reasonable security measures, etc.  River Place is required by law to maintain a safe environment for its tenants with reasonable security measures.

12. River Place has no dedicated Information Technology or cybersecurity resources.

13. Mr. von der Schmidt and Ms. Ngô were the victims of an onslaught of cybercrimes and harassment in April 2022 while they resided at River Place.

14. Higgins, River Place Head of Security, spoke with Mr. von der Schmidt over the phone about the matter on or around April 16, 2022, while Higgins was audibly intoxicated.

15. Higgins asked Mr. von der Schmidt to sign an NDA, a request Mr. von der Schmidt declined due to pending litigation in another matter.

16. A week later, Higgins engaged in slander against Mr. von der Schmidt to his family members after Mr. von der Schmidt had declined the request to sign an NDA the prior week regarding the cyber intrusions and harassment.

17. Mr. Higgins knowingly defamed Mr. von der Schmidt with unsolicited outreach to Mr. von der Schmidt's family members, accusing him of having "paranoid delusions" on April 23, 2022, after individuals had harassed the couple at their front door in the middle of the night.

18. Higgins later admitted that he was "not a psychiatrist" or otherwise qualified to render such a diagnosis.

19. Moreover, Higgins's claims were contradicted by hard evidence that corroborates the couple's account of the harassment they had experienced while in their apartment at 1 River Place.

20. Higgins admitted that he is "not a psychiatrist" or otherwise qualified to render any medical diagnosis and that Mr. von der Schmidt had "never had an issue" in thirteen prior years of

residence.

21. Despite Mr. von der Schmidt and Ms. Ngô's consistent accounts of the various privacy breaches at their apartment, Higgins continued to express to numerous people that Mr. von der Schmidt had mental illness even as he admitted that he was not qualified to make such claims.

22. Higgins's defamatory actions have deleteriously and irrevocably affected Mr. von der Schmidt's relationships with the family members to whom Higgins reached out.

23. Mr. von der Schmidt and Ms. Ngô had been explicit with management about their security concerns in the wake of active harassment and retaliation concerning separate litigation.

24. Before Higgins's defamatory statements, Mr. von der Schmidt and Ms. Ngô had been assured that the River Place concierge had fixed instructions that all visitors would be announced before being allowed up to their apartment. Friends and family who visited the couple at their apartment during this time can readily corroborate such measures.

25. On April 17, 2022, there was an attempt to gain unauthorized entry to Mr. von der Schmidt and Ms. Ngô's apartment with a key belonging to 2319, as evidenced by the building's access logs furnished by the management office on April 18, 2022.

26. In the early hours of Friday, April 23, 2022, staff ceased such security measures entirely, guiding an intruder posing as food delivery personnel to the Plaintiff's apartment directly.

27. The front desk granted access to the residents' elevators after midnight without notifying Mr. von der Schmidt or Ms. Ngô or asking the individual for identification.

28. This individual would be captured on River Place security footage, which included a photo of him being directed upstairs by the front desk.

29. Hours later, a River Place security guard, who had switched posts with another individual and brought a black bag with him, gave the name "Miguel" after arriving at the couple's front door and said that he was there "to keep [them] safe," insisting that they "go to sleep."

30. "Miguel" proceeded to harass the couple by blasting music outside the door, shaking the door handle while taunting them, and yelling at the couple through the door.

31. After reporting this activity to the concierge, Mr. von der Schmidt and Ms. Ngô were informed by witnesses that this individual was not a familiar staff member, that his name was

not "Miguel" but rather "David," and that this person's behavior was suspiciously hostile.

32. He was later disciplined by management for making a scene in the lobby.

33. Colella, River Place management and building engineer, became hostile and antagonistic when the couple informed him of the security breach.

34. Colella accused only Mr. von der Schmidt of making up that night's harassment while ignoring Ms. Ngô's account of the same events.

35. Colella initially claimed that the first intruder was specifically a food delivery for 3605, but later changed his story to food delivery for 3206, a completely different floor and apartment. Neither of these units ordered food to be delivered at that time.

36. Higgins and Corella's false claims are contradicted by security footage showing the intruder entering the elevator from the lobby, exiting on the thirty-sixth floor, and re-entering the elevator on the thirty-second floor, having changed his hat from black to green in the stairwell after hearing Mr. von der Schmidt report his description to the concierge on the apartment intercom.

37. Colella initially lied to Mr. von der Schmidt about there being an employee matching the description of the security guard who had given the false name "Miguel" and had harassed Mr. von der Schmidt and Ms. Ngô.

38. In the hallway, Colella acknowledged a breach of security protocols in light of the chair and equipment bag that had been brought up to the 36th floor against policy.

39. Later in the leasing office, Colella conceded to Ms. Ngô that there was, in fact, an employee matching that description.

40. Colella and a member of leasing management treated Ms. Ngô with contempt while she voiced her safety concerns regarding the security breach and inappropriate behavior of their employees.

41. Mr. von der Schmidt and Ms. Ngô were forced to flee their apartment for fear of pressing safety concerns made possible by management's security negligence.

42. River Place building management is also responsible for the loss of income suffered by Ms. Ngô, who was unable to return to work in Manhattan due to the traumatic incidents that occurred at her residence and the neglectful and hostile manner in which her accounts were

received by River Place management.

43. The events of April 23 have also precluded the couple from seeking gainful employment in the New York area.

44. Moreover, Mr. von der Schmidt and Ms. Ngô now suffer from emotional distress caused by River Place building management's negligence and security lapses.

45. River Place Management does not take the safety and security of their residents seriously. Upon information and belief, Mr. von der Schmidt and Ms. Ngô have not been the only tenants at River Place to experience harassment by an unwelcome intruder into the building.

46. Even in the wake of prior incidents, River Place failed to execute simple security protocols such as checking identification or announcing visitors. These lapses directly resulted in a dangerous string of incidents that caused permanent emotional injury to two of its model residents.

### COUNT ONE
### AS FOR THE FIRST CAUSE OF ACTION
### Intentional Infliction of Emotional Distress
### (On behalf of Plaintiffs against Corporate Defendant)

47. Plaintiffs incorporate herein by reference as if outlined in full the averments of this Complaint.

48. Under New York Law, [IIED] has four elements: (i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial possibility of causing severe emotional distress; (iii) a causal connection between the conduct and injury; and (iv) severe emotional distress.'" *Saleh*, 2013 U.S. Dist. LEXIS 142207, 2013 WL 5439140, at *11. *Tigano v. United States*, 527 F. Supp. 3d 232, 246 (E.D.N.Y. 2021).

### EXTREME AND OUTRAGEOUS CONDUCT

49. As detailed above, Defendants engaged in several acts of extreme and outrageous conduct. The following is a sample of the extreme and outrageous conduct visited upon the Plaintiffs:

    a. Allowing a strange and dangerous individual to enter Plaintiff's apartment floor and harass the Plaintiffs,

    b. Denying that the incident occurred in spite of the tangible evidence that it did,

    c. Attempting to coerce the Plaintiffs into signing an NDA preventing the Plaintiffs from speaking about the incident and preventing the Plaintiffs from filing suit for negligence in exchange for Plaintiff's continued tenancy at River Place,

    d. Calling Plaintiff's family and friends and disparaging Plaintiff's character by referring to Plaintiffs as psychotic, crazy, and delusional. All the while knowing that Plaintiff's claims were accurate, as evidenced by the camera and photo evidence.

### DEFENDANTS INTENDED TO CAUSE THE PLAINTIFFS HARM

50. It is evident from the Defendants' attempted forced NDA, and their unrelenting defamatory statement, that the Defendants intended to cause Plaintiff harm.

### THERE WAS A CAUSAL CONNECTION BETWEEN DEFENDANT'S CONDUCT AND PLAINTIFF'S INJURIES

51. As detailed above, the temporal proximity between Plaintiff's experiencing the invasive harassment by a stranger posing as a delivery person and Defendant's corporation's intentional acts detailed in the preceding paragraphs are so close that it removes all doubt of harm visited upon Plaintiff's.

### PLAINTIFF'S SUFFERED SEVERE EMOTIONAL DISTRESS

52. As evidenced by Mr. von der Schmidt and Ms. Ngô's medical provider's medical records, Mr. von der Schmidt and Ms. Ngô have suffered immensely. The details of Mr. von der Schmidt and Ms. Ngô's mental and emotional distress can be revealed under seal.

53. The Defendants' conduct was an intentional, willful, deliberate, and callous disregard for Ms. Ngô and Mr. von der Schmidt's rights. As a result of the Defendants' actions, Plaintiffs von der Schmidt and Ngô have suffered and will continue to suffer both economic and non-economic harm. Plaintiffs are entitled to all legal and equitable remedies available under the law.

### COUNT TWO
### AS FOR THE SECOND CAUSE OF ACTION
### Negligent Hiring, Retention
### (On behalf of Plaintiffs against Corporate Defendants)

54. Plaintiffs incorporate herein by reference as if outlined in full the averments of this Complaints.

55. A cause of action for negligent hiring and retention requires allegations that an employer knew of its employee's harmful propensities, that it failed to take necessary action, and that this failure caused damage to others (*see Gonzalez v City of New York*, 133 AD3d 65, 67-68, 17 N.Y.S.3d 12 [1st Dept 2015]; Restatement [Second] of Agency § 213, Comment *d*).  The cause of action does not need to be pleaded with specificity (*Doe v Enlarged City Sch. Dist. of Middletown*, 195 AD3d 595, 596, 144 N.Y.S.3d 639 [2d Dept 2021]; *see JG v Goldfinger*, 161 AD3d 640, 641, 79 N.Y.S.3d 1 [1st Dept 2018]).  *Waterbury v. N.Y.C. Ballet, Inc.*, 2022 NY Slip Op 02890, ¶ 4, 205 A.D.3d 154, 160, 168 N.Y.S.3d 417, 423 (App. Div.).

**DEFENDANT CORPORATION KNEW OF HIGGINS HARMFUL PROPENSITIES**

56. As detailed above, upon information and belief, Higgins was a known alcoholic by the residents and administration of River Place.

57. Upon information and belief, on multiple occasions, Higgins has appeared visibly intoxicated within the common areas of River Place.  Plaintiffs have reported Higgins's public intoxication to building management.

58. As a direct result of the Defendant's failure to terminate or discipline Higgins due to his multiple acts of public intoxication, Higgins engaged in a campaign of defamation against the Plaintiffs.

59. The Defendants' conduct was intentional, willful, deliberate, and in callous disregard for Plaintiff's rights.  As a result of Defendant's actions, the Plaintiffs have suffered and will continue to suffer economic and non-economic harm.  Plaintiffs are entitled to all legal and equitable remedies available under the law.

### COUNT THREE
### AS FOR THE THIRD CAUSE OF ACTION
### (Defamation – Slander Per Se)

60. Plaintiff's repeats and realleges all paragraphs above as though fully set forth herein.

61. Under New York law, statements that "tend to injure another in his or her trade, business or profession" are considered defamation per se.  *Liberman v Gelstein*, 80 NY2d 429, 435 [1992].

62. Higgins engaged in slander against Mr. von der Schmidt to his family members after Mr. von

der Schmidt had declined the request to sign an NDA the prior week regarding the cyber intrusions and harassment.

63. Mr. Higgins knowingly defamed Mr. von der Schmidt with unsolicited outreach to Mr. von der Schmidt's family members, accusing him of having "paranoid delusions" on April 23, 2022, after individuals had harassed the couple at their front door in the middle of the night.

64. Higgins later admitted that he was "not a psychiatrist" or otherwise qualified to render such a diagnosis.

65. Moreover, Higgins's claims were contradicted by hard evidence that corroborates the couple's account of the harassment they had experienced while in their apartment at 1 River Place.

66. Higgins admitted that he is "not a psychiatrist" or otherwise qualified to render any medical diagnosis and that Mr. von der Schmidt had "never had an issue" in thirteen prior years of residence.

67. Despite Mr. von der Schmidt and Ms. Ngô's consistent accounts of the various privacy breaches at their apartment, Higgins continued to express to numerous people that Mr. von der Schmidt was suffering from mental illness even as he admitted that he was not qualified to make such claims.

68. Higgins's defamatory actions have deleteriously and irrevocably affected Mr. von der Schmidt's relationships with the family members to whom Higgins reached out."

69. These statements are false. Plaintiff is not suffering from mental illness.

70. Higgin's statements were made to Plaintiff's immediate family, friends, and neighbors. Higgins is a virtual stranger (only knowing the plaintiffs through their interactions in River Place) to Plaintiff making false claims to public audiences and had no privilege or authorization to make such false claims.

71. Defendant Higgins knew that these statements were false, and he deliberately made them for the sole purpose of wrongfully damaging Plaintiff's reputation.

72. Accordingly, Plaintiff seeks injunctive relief in the form of an order directing Higgins to issue a public apology, correcting the record of his claims about Mr. von der Schmidt's mental health.

73. Plaintiff further seeks damages in an amount to be determined at trial but in any event no less

than $2,000,000, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

## COUNT FOUR
## FOURTH CAUSE OF ACTION
### (Defamation -Slander)

74. The Plaintiff's repeats and realleges all paragraphs above as though fully set forth herein.

75. Under New York law, an action for defamation requires the following elements: (1) publication, (2) to a third party, (3) of a false statement about the Plaintiff, (4) without privilege or authorization.  "A defamatory statement is one which tends to expose a person to hatred, contempt or aversion, or to induce an evil or unsavory opinion of him in the minds of a substantial number of the community."  Knutt v Metro Intern., S.A., 91 AD3d 915, 916 [2d Dept 2012].

76. Higgins engaged in slander against Mr. von der Schmidt to his family members after Mr. von der Schmidt had declined the request to sign an NDA the prior week regarding the cyber intrusions and harassment.

77. Mr. Higgins knowingly defamed Mr. von der Schmidt with unsolicited outreach to Mr. von der Schmidt's family members, accusing him of having "paranoid delusions" on April 23, 2022, after individuals had harassed the couple at their front door in the middle of the night.

78. Higgins later admitted that he was "not a psychiatrist" or otherwise qualified to render such a diagnosis.

79. Moreover, Higgins's claims were contradicted by hard evidence that corroborates the couple's account of the harassment they had experienced while in their apartment at 1 River Place.

80. Higgins admitted that he is "not a psychiatrist" or otherwise qualified to render any medical diagnosis and that Mr. von der Schmidt had "never had an issue" in thirteen prior years of residence.

81. Despite Mr. von der Schmidt and Ms. Ngô's consistent accounts of the various privacy breaches at their apartment, Higgins continued to express to numerous people that Mr. von der Schmidt was suffering from mental illness even as he admitted that he was not qualified to make such claims.

82. Higgins's defamatory actions have deleteriously and irrevocably affected Mr. von der

Schmidt's relationships with the family members to whom Higgins reached out."

83. These statements are false.  Plaintiff is not suffering from mental illness.

84. Higgin's statements were made to Plaintiff's immediate family, friends, and neighbors. Higgins is a virtual stranger (only knowing the plaintiffs through their interactions in River Place) to Plaintiff making false claims to public audiences and had no privilege or authorization to make such false claims.

85. Defendant Higgins knew that these statements were false, and he deliberately made them for the sole purpose of wrongfully damaging Plaintiff's reputation.

86. Accordingly, Plaintiff seeks injunctive relief in the form of an order directing Small to remove the defamatory video and issue a correction/apology.

87. Plaintiff further seeks damages in an amount to be determined at trial but in any event no less than $2,000,000, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

## JURY DEMAND

Plaintiffs demand a trial by jury as to all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against all Defendants, jointly and severally, as follows:

   a. For past, present, and future general damages in an amount to be determined at trial;
   b. For past, present, and future special damages, including but not limited to past, present, and future lost earnings, economic damages, and others, in an amount to be determined at trial;
   c. Any appropriate statutory damages;
   d. For costs of suit;
   e. For interest as allowed by law;
   f. For attorney's fees;

g. On the third cause of action for Defamation – Slander Per Se, a judgment against Defendant Small awarding Plaintiff damages in an amount to be determined at trial, but in any event no less than $2,000,000, plus prejudgment interest, costs, and attorney's fees, as well as injunctive relief, in the form of an order directing Small to remove the defamatory video and issue a correction/apology;

h. On the fourth cause of action for Defamation – Slander, a judgment against Defendant Small awarding Plaintiff damages in an amount to be determined at trial, but in any event no less than $2,000,000, plus prejudgment interest, costs, and attorney's fees, as well as injunctive relief, in the form of an order directing Small to remove the defamatory video and issue a correction/apology;

i. For such other and further relief as the Court may deem proper.

Dated: April 19, 2023
Brooklyn, New York

*Tyrone A. Blackburn, Esq.*
Tyrone A. Blackburn, Esq.